1  B. Kristian W. Rasmussen, III, FL Bar No. 0229430
   LEVIN, PAPANTONIO, THOMAS,
2    MITCHELL, ECHSNER & PROCTOR, P.A.
   316 South Baylen Street, Suite 600 (32502)
3  P. O. Box 12308
   Pensacola, Florida 32591
4  Telephone: (850) 435-7080
   Facsimile: (850) 435-7020
5
   Attorneys for Plaintiff
6

7
                    IN THE UNITED STATES DISTRICT COURT
8
                   FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
                            (SAN FRANCISCO DIVISION)
10

11 | **In re: Bextra and Celebrex Marketing Sales** | **MDL No. 1699** |
   | **Practices and Product Liability Litigation** |
12 | | **District Judge: Charles R. Breyer** |
   | | **Magistrate:** |
13

14

15 | **DANA CHIN**, individually and on | Case No. _____ |
16 | behalf of **TATE McALLISTER**, | |
   | deceased, | **CIVIL COMPLAINT** |
17 | Plaintiff, | |
18 | | |
   | v. | **JURY TRIAL DEMANDED** |
19 | | |
   | PFIZER, INC., PHARMACIA CORP., and | |
20 | G.D. SEARLE & CO., | |
21 | Defendants. | |

22

23        **DANA CHIN**, as Personal Representative of the Estate of **TATE McALLSTER**,

24 deceased, Plaintiff, through counsel and pursuant to applicable law and Nevada's Wrongful Death

25 Act, by and through counsel, brings this action against Defendants PFIZER, INC., PHARMACIA

26 CORP., and G.D. SEARLE & CO. (hereafter "Defendants") and alleges as follows:

27

28

   Celebrex-NV-MDL                                                    COMPLAINT

## I.   PARTIES

1.     This is an action for damages arising from Defendants' design, manufacture, sale, testing, marketing, advertising, promotion, and/or distribution of the unsafe medication Celebcoxib, trade name CELEBREX® ("Celebrex").

2.     Plaintiff and decedent were at all relevant times adult resident citizens of the State of Nevada.  Decedent, Tate McAllister, was, during his life, a resident of Washoe County and the Plaintiff, Dana Chin, is a resident of Washoe County.  Plaintiff, Dana Chin, is the Personal Representative of the decedent's estate, is a resident of Nevada, and is the proper party to bring this claim on behalf of the Estate and survivors of decedent.  At the time of decedent's death, decedent left no surviving parents and five siblings: Margaret Renners, Edna McCraw, Pauline Rodgers, Dorothy Davidson, and Virginia Smith.

3.     Defendant Pfizer, Inc. ("Pfizer") is a Delaware corporation with its principal place of business in New York, New York.  In 2003, Pfizer acquired Pharamcia for nearly \$60 billion.  At all relevant times Pfizer and/or its predecessors in interest were engaged in the business of designing, testing, manufacturing, packaging, marketing, distributing, promoting, and selling the drug Celecoxib, under the trade name Celebrex in California, Nevada and nationwide.

4.     Defendant Searle ("Searle") is a Delaware corporation with its principal place of business in Illinois.  At all relevant times, Searle has been engaged in the business of marketing and selling CELEBREX nationwide and in California and Nevada.  Searle is a subsidiary of Pfizer, acting as its agent and alter ego in all matters alleged within this Complaint.

5.     Defendant Pharmacia ("Pharmacia") is a Delaware corporation with its principal place of business in New Jersey.  At all relevant times, Pharmacia, and its predecessors in interest have been engaged in the business of designing, testing, manufacturing, packaging, marketing, distributing, promoting, and selling Celebrex nationwide and in California and Nevada.

6.     Celebrex was developed by Pharmacia Corp. ("Pharmacia").  Searle and Pharmacia are now both subsidiaries of Pfizer Inc. ("Pfizer").

Celebrex                                    - 2 -                                    COMPLAINT

## II.   JURISDICTION AND VENUE

7.   This is an action for damages, which exceeds seventy-five thousand dollars ($75,000.00).

8.   There is complete diversity of citizenship between the Plaintiff and Defendants. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.A. § 1332 (diversity jurisdiction) because the amount in controversy exceeds $75,000.00, and because there is complete diversity of citizenship between Plaintiff and Defendants.

9.   Venue is proper in the District of Nevada, Reno Division ("the District") pursuant to 28 U.S.C.A. § 1391. Defendants marketed, advertised and distributed the dangerous product in the district, thereby receiving substantial financial benefit and profits the dangerous product in this district, and reside in this district under 28 U.S.C.A. § 1391(c), such that venue is proper.

10.   At all relevant times herein, Defendants were in the business of designing, manufacturing, marketing, developing, testing, labeling, promoting, distributing, warranting and selling their product, Celebrex. Defendants at all times relevant hereto designed, developed, manufactured, promoted, marketed, distributed, tested, warranted and sold in interstate commerce (including California and Nevada) the aforementioned prescription drug. Defendants do substantial business in the State of Nevada and within the District, advertise in the district, receive substantial compensation and profits from sales of Celebrex in the District, and made material omissions and misrepresentations and breaches of warranties in the District so as to subject them to *in personam* jurisdiction in the District. In engaging in the conduct alleged herein each defendant acted as the agent for each of the other defendants, or those defendant's predecessors in interest.

## III.   INTERDISTRICT ASSIGNMENT

11.   Assignment to the San Francisco Division is proper as this action is related to *In Re: Bextra and Celebrex Marketing Sales Prac. and Pro. Liab. Lit.*, MDL-1699, assigned to the Honorable Charles R. Breyer by the Judicial Panel on Multidistrict Litigation on September 6, 2005.

## IV.    FACTUAL BACKGROUND

### A.    Facts Regarding Plaintiff

12.    Decedent was prescribed, and began taking, Celebrex on or about September 30, 2002.

13.    As a direct and proximate result of using Celebrex, Decedent suffered severe cardiovascular injuries. Specifically, on or about January 24, 2005, Decedent suffered an acute myocardial infarction ("heart attack"), which caused Plaintiff's death on or about July 27, 2007.

14.    Unaware of the risks presented by Celebrex, or that Celebrex was the cause of his injuries, Decedent continued to take Celebrex until January 24, 2005.

15.    Decedent and Decedent's healthcare providers were at the time of Decedent's heart attack and initial injury unaware—and could not have reasonably known or have learned through reasonable diligence—that such injury directly resulted from Defendants' negligent and otherwise culpable acts, omissions, and misrepresentations or from Decedent's ingestion of Celebrex.

16.    Decedent used Celebrex in a proper and reasonably foreseeable manner and used it in a condition that was substantially the same as the condition in which it was manufactured and sold.

17.    Decedent would not have used Celebrex had Defendants properly disclosed the risks associated with the drug.

### B.    Facts Regarding Celebrex: Science and other Cox-2 Inhibitors

18.    Celebrex is one of a class of pain medications called non-steroidal anti-inflammatory drugs ("NSAIDs"). Aspirin, naproxen (trade name Aleve), and ibuprofen (trade name Advil) are examples of well-known NSAIDs.

19.    NSAIDs reduce pain by blocking the body's production of pain transmission enzymes called cyclo-oxygenase or "COX." There are two forms of COX enzymes—COX-1 and COX-2. Aspirin, naproxen and ibuprofen all act by blocking COX-1 and COX-2 enzymes.

Celebrex                                    - 4 -                                    COMPLAINT

20.    In addition to decreasing inflammation, the prostaglandins that are supported by COX-1 enzymes are involved in the production of gastric mucus; this protects the stomach wall from the hydrochloric acid present in the stomach. It is generally accepted in the medical community that by blocking the COX-1 enzyme, the body's ability to protect gastric tissue is hampered and as a result, can cause harmful gastrointestinal side effects, including stomach ulceration and bleeding.

21.    Prostaglandin I2 is the predominant cyclooxygenase product in endothelium, inhibiting platelet aggregation (preventing clot formation), causing vasodilation, and preventing the proliferation of vascular smooth muscle. Whereas older NSAIDS inhibit Thromboxane A2 and Prostaglandin I2, the COX-2 inhibitors leave Thromboxane A2 unaffected. Thromboxane A2 is a potent platelet aggregator and vasoconstrictor which is synthesized by platelets. Therefore, while the older NSAIDS suppress platelet aggregation and vasoconstriction, the COX-2 inhibitors support it.

22.    Traditional NSAIDs like aspirin reduce pain/inflammation and therefore pain by inhibiting both COX-1 and COX-2 enzymes simultaneously. As would be expected, traditional NSAIDs may cause ulcers in the stomach. However, traditional NSAIDs do not cause blood clots, rather they actually reduce the risk of clots and help protect heart function.

23.    Defendants and other pharmaceutical companies set out to remedy these ulcer and bleeding problems suffered by some NSAID users by developing "selective" inhibitors that would block only COX-2 production, thus (supposedly) allowing the proper maintenance of gastric tissue while still reducing inflammation.

24.    In making this decision, Defendants and their predecessors in interest either intentionally ignored or recklessly disregarded current medical knowledge that selective COX-2 inhibition lowers prostacyclin levels and causes thromboxane $A_2$ to be uninhibited, causing blood clots, and giving rise to various clot-related cardiovascular events, including heart attack, stroke, unstable angina. The vasoconstriction and fluid retention cause the hypertension.

25.    Pfizer launched Celebrex, the first of the three major COX-2 inhibitor drugs, in January 1999 and initiated a massive marketing campaign to convince doctors and

1    consumers of the superiority of their new "blockbuster" drug over less inexpensive NSAIDs.  In

2    May, 1999, Merck & Co., Inc. ("Merck") launched Vioxx, its own selective COX-2 inhibitor.

3           26.    Seeking increased market share in this extremely lucrative market,

4    Defendants, and their predecessors in interest, also sought approval of a "second generation"

5    selective COX-2 inhibitor and filed for FDA approval of Valdecoxib (Bextra) on January 16,

6    2001 for the (i) prevention and treatment of acute pain, (ii) treatment of primary dysmenorrhea,

7    and (iii) relief of the signs and symptoms of osteoarthritis and adult rheumatoid arthritis.

8    **C.    Facts Regarding Celebrex's Safety and Defendants' Knowledge Thereof**

9           27.    The potential for cardiovascular risk of selective COX-2 inhibitors was

10   known to Defendants long before the market launch.  By 1997, and prior to the submission of the

11   New Drug Application (the "NDA") for Celebrex, Defendants was aware that, by inhibiting

12   COX-2, Celebrex altered the homeostatic balance between prostacylin synthesis and

13   thromboxane and thereby, increased the prothrombotic effects of the drugs, causing blood clots to

14   form in those who ingested it.  *See* Topol, E.J., *et al.*, *Risk of Cardiovascular Events Associated*

15   *with Selective Cox-2 Inhibitors*, *JAMA*, August 22, 2001 at 954.

16          28.    As Pharmacologist, Dr. Garrett Fitzgerald, of the University of

17   Pennsylvania, reported in an editorial published in *The New England Journal of Medicine* on

18   October 21, 2004, that it was known as early as 1999 that selective COX-2 inhibitors, such as

19   Celebrex, suppressed the formation of prostaglandin I-2 in healthy volunteers, inhibited platelet

20   aggregation in vitro, and may predispose patients to myocardial infarction or thrombotic stroke.

21          29.    Based on the studies performed on Celebrex, other COX-2 inhibitors, and

22   basic research on this type of selective inhibitor which had been widely conducted, Defendants

23   knew when Celebrex was being developed and tested that selective COX-2 inhibitors posed

24   serious cardiovascular risks for anyone who took them, and presented a specific additional threat

25   to anyone with existing heart disease or cardiovascular risk factors.  Studies show that selective

26   COX-2 inhibitors, including Celebrex, decrease blood levels of a prostacyclin.  When those levels

27   fall, the arteries are more vulnerable to clotting, high blood pressure, heart attack, and stroke.

28

30.     Despite years of studies on selective COX-2 inhibitors, as well as the disturbing new studies specifically analyzing the risks of Celebrex, Defendants failed to take any action to protect the health and welfare of patients, but instead, continued to promote the drug for sale even after the FDA's Drug Safety and Risk Management Advisory Committee and Arthritis Drug Advisory Committee meetings.

1.     **Celebrex and Cox-2 Studies Did Not Show Celebrex to be Safe**

31.     The defendants touted the Celebrex Long-Term Arthritis Safety Study ("CLASS") as the primary evidence to support its theory that Celebrex was safer for consumers that could not tolorate traditional NSAIDs in their gastrointestinal system. (CLASS data is found in NDA 20-998/S-009 submitted to the FDA by G.D. Searle on June 12, 2000. CLASS was submitted to the FDA on June 12, 2000 and reviewed by James Witter, M.D., Ph.D. (FDA Medical Officer) on September 20, 2000.)

2.     **CLASS**

32.     The FDA Medical Officer Review of the CLASS data proves Celebrex is no more efficacious than other traditional NSAIDS and is harmful to consumers. See generally, FDA Medical Officer Review, NDA 20-998/S-009 submitted to the FDA by G.D. Searle on June 12, 2000 ("FDA CLASS Review"). On April 7, 2005, the FDA issued an *Alert* noting only minimal information is available regarding Celebrex: "The only available data from a long term comparison of Celebrex to other NSAIDs came from the CLASS study...."

33.     Pfizer misrepresented the data in CLASS by using biased authors. According to the *Washington Post* the CLASS authors were either employees of Pharmacia, Celebrex's manufacturer, or paid consultants of the company. Pfizer needed a study to demonstrate that its Cox-2 inhibitor was safer for the stomach than older cheaper medications: CLASS was designed to be that study. Unfortunately, the results of the completed study revealed the truth – Celebrex offered no gastrointestinal (GI) benefit. Instead of releasing the complete – 12-month – results from CLASS, Pfizer had only the first six months of data published in the Journal of American Medicine. JAMA 2000,48:1455-1460.

1    34.    "After reviewing the full study, the FDA's arthritis advisory committee

2    concluded that Celebrex offers no proven safety advantage over the two older drugs in reducing

3    the risk of ulcer complications, said FDA spokesman Susan Cruzan." *Washington Post,* August 5,

4    2001.    According to the FDA's review of the CLASS data: "Celecoxib did not demonstrate any

5    statistical superiority to NSAIDs (pooled) or either comparator (diclofenac and ibuprofen) with

6    regards to the primary safety endpoint of CSUGIE (Clinically Significant Upper Gastrointestinal

7    Adverse Events) at any point in the trial although there were trends that favored celecoxib" (FDA

8    CLASS Review)

9    35.    According to an August 5, 2001 article in the *Washington Post*, editors of

10    the Journal of the American Medical Association (JAMA) and other medical experts, "were

11    flabbergasted" when they realized they had been duped by only being provided with the first six

12    months of CLASS data. The Washington Post reported JAMA editors as saying: "When all of the

13    data were considered, most of Celebrex's apparent safety advantage disappeared."

14    36.    The "scientific double-cross" boosted sales. "[T]he JAMA article and

15    editorial have likely contributed to Celebrex's huge sales. 'When the JAMA article comes out and

16    confirms the hype, that probably has more impact than our labeling does,' said Robert J. Temple,

17    director of medical policy at the FDA's Center for Drug Evaluation and Research." *Washington

18    Post*, August 5, 2001.

19    37.    "A total of 36 deaths occurred during the [CLASS] study or during post

20    study follow-up: 19 in the celecoxib group, 9 in the diclofenac group and 8 in the ibuprofen

21    group . . . . Most deaths were cardiovascular in nature." FDA CLASS Review, at 54. The

22    increased number of adverse cardiovascular events in the Celebrex group were not surprising as

23    they were also revealed in the original New Drug Application (NDA) submitted for Celebrex. "In

24    the original NDA, myocardial infarction was noted to occur at a higher rate in celecoxib-treated

25    as compared to placebo treated patients. In the long term trial (Trial 024) that was included in the

26    NDA submission, the predominate (>90%) cause of death for patients taking celecoxib at any

27    does was cardiovascular." FDA CLASS Review at 78.

28    38.    Public Citizen, a public watchdog organization, reviewed the CLASS data

1    in its entirety. A complete review reveals the combined anginal adverse events was 1.4% in

2    celecoxib (Celebrex) group versus 1.0% in either NSAID group. Specifically, the rate of heart

3    attack in the Celebrex was double that of the other two NSAIDs, 0.2% vs. 0.1%, respectively.

4            39.    The CLASS data proves that Pfizer knew that its first generation Cox-2

5    inhibitor, Celebrex, caused a disproportionately and statistically significantly high number of

6    adverse cardiovascular events before it was introduced to the market in January 1999. According

7    to Public Citizen, after CLASS, the FDA recommended a trial to specifically assess the CV risk

8    of COX-2 inhibitors. The Adenoma Prevention with Celecoxib (APC) trial was intended to be

9    this placebo-controlled trial of Celebrex.

10           **3.    APC Trial**

11           40.    The Adenoma Prevention with Celecoxib (APC) trial compared the

12    efficacy and safety of celecoxib with placebo. N.Eng. J. Med. 352;11 at 1072. According to the

13    APC trial, the number of deaths from cardiovascular causes was significantly higher in the

14    Celebrex group when compared to placebo. (0.1% placebo; 0.4% Celebrex 200mg; and 0.9%

15    Celebrex 400mg). Id. at 1075.

16           41.    The FDA Reported the APC data as follows[1]:

17           In the National Cancer Institute's Adenoma Prevention with
       Celecoxib (APC) trial in patients at risk for recurrent colon polyps,
18     a 2-3 fold increased risk of serious adverse CV events was seen for
       Celebrex compared to placebo after a mean duration of treatment of
19     33 months. There appeared to be a dose response relationship, with
       a hazard ratio of 2.5 for Celebrex 200 mg twice daily and 3.4
20     Celebrex 400 mg twice daily for the composite endpoint of death
21     from CV causes, myocardial infarction (MI), or stroke.

22           42.    The dosage noted in the study is important for two reasons: first, there

23    appears to be an association between dosage and the increase in adverse cardiovascular events.

24    See generally, at 1077. Second, most patients increase dosage. Pfizer knew patients were

25    increasing their dosages as noted in CLASS: "Interestingly ... up to 70% of patients increased

26    their dose for celecoxib." FDA CLASS Review at 74. Thus, Pfizer was aware of the dosage

27    creep.

28    _____

[1] April 7, 2005 FDA Alert: www.fda.gov/cder/drug/infopage/celebrex/celebrex-hcp.htm.

1

**4.    Other Celebrex Trials**

2    43.    Several other Celebrex trials also gave Defendants insight into the

3    cardiovascular risks presented by Celebrex. The Prevention of Spontaneous Adenomatous Polyps

4    (PreSAP) trial identified the death rate from cardiovascular causes (heart attack, stroke, heart

5    failure, angina, or need for CV procedure) as 3.6% with Celebrex as compared to 2.7% for

6    placebo.

7    44.    Public Citizen also reviewed the results of Study IQ IQ5-97-02-001 which

8    reflected "the combined rate of all serious cardiovascular adverse events in patients getting a

9    placebo was 2.1% but was greatly increased in those getting celecoxib to 7.7%, a 3.6 fold

10    increase in CV risk in those people taking celecoxib. (p=0.03)"[2]. According to Dr. Sidney Wolfe,

11    "The study revealed a significantly increased rate (3.6-fold) of serious CV adverse events and

12    more than a doubling in the rate of CV deaths in people using celecoxib compared to those using

13    placebo."[3]

14

**5.    Cox-2 Studies: VIGOR and APPROVe**

15    45.    Pfizer also had access to other data which indicated a cardiovascular risk

16    with its drugs. Specifically, Pfizer had knowledge of two studies conducted by Merck related to

17    its Cox-2 inhibitor Vioxx – Vioxx Gastrointestinal Outcomes Research (VIGOR) and

18    Adenomatous Polyp Prevention (APPROVe).

19

**a.    VIGOR**

20    46.    In 2000, The FDA Medical Officer Review of CLASS specifically noted

21    the VIGOR trial and the concern over serious adverse cardiovascular events. FDA CLASS

22    Review at 78.

23    47.    According to VIGOR (near acronym for Vioxx Gastrointestinal Outcomes

24    Research) Vioxx patients experienced 20% more serious clinical adverse events (statistically

25    significant); they experienced 4.6 times more hypertension events serious enough to warrant

26    discontinuation, 1.7 times more edema events, and 1.85 times as many congestive heart failure

27

28    [2] *Public Citizen*, January 26, 2005, Dr. Sidney M. Wolfe.
     [3] Id.

Celebrex                                    - 10 -                                    COMPLAINT

1    adverse events. By two measures of cardiovascular events related to blood clots, Vioxx had twice
2    the risk of naproxen and the results were considered statistically significant.

3        48.    The VIGOR study comprised the most definitive scientific evidence ever
4    obtained about pharmaceutical products. It was a large, randomized clinical trial, the gold
5    standard of medical research. It was a safety study with endpoints set in advance. As Merck
6    stated many times, it was designed to provide definite proof of safety, convincing enough to
7    silence the most skeptical critics. In medical terms, the VIGOR results raised the question of
8    whether selective inhibition of Cox-2 was a monumental mistake from the start. While the
9    NSAID risks to the GI system were real and sometimes fatal, they were dwarfed by the
10   cardiovascular risks of the arthritis population that needed these drugs on a daily basis. All
11   makers of NSAIDs, including Defendants, were aware of these results.

### b.    APPROVe

13       49.    Anxious to put safety questions surrounding Vioxx to rest, Merck designed
14   another large scale trial, Adenomatous Polyp Prevention (APPROVe), which was intended to test
15   the drug's ability to prevent or shrink colon polyps, but would also compare the cardiovascular
16   safety of Vioxx to a placebo control. According to the analysis conducted by Public Citizen of
17   the APPROVe data: Vioxx "doubled the risk of any thrombotic cardiovascular event" and
18   "doubled the risk of MI (myocardial infarction a/k/a heart attack)[4]. *Public Citizen*, January 24,
19   2005, at 15. Despite the available Celebrex data and other information related to Vioxx, Pfizer
20   never paused to re-evaluating the Celebrex data and studies.

21       50.    The scientific data available during and after Celebrex's approval process
22   made clear to Defendants that their formulation of Celebrex would cause a higher risk of blood
23   clots, stroke and/or myocardial infarctions among Celebrex consumers, alerting them to the need
24   to do additional and adequate safety studies.

---

27   [4] Although Merck claims that the two-fold risk of heart attacks and strokes seen in the APPROVe trial did not
     emerge until after patients had been taking the drug for 18 months, closer analysis indicates that significant increase
28   in risk of heart attack was evident in as little as 4 months time.

1    51.    As stated by Dr. Topol on October 21, 2004, in *The New England Journal*
2    *of Medicine*, outlining Defendants' failure to have conducted the necessary trials before
3    marketing to humans " . . . it is mandatory to conduct a trial specifically assessing cardiovascular
4    risk and benefit of (COX-2 inhibitors). Such a trial needed to be conducted in patients with
5    established coronary artery disease, who frequently have coexisting osteoarthritis requiring
6    medication and have the highest risk of further cardiovascular events."

7    52.    Dr. Topol was also the author on the study published in August 2001 in
8    JAMA (listed above) that reported an increased risk of thrombotic cardiovascular events in
9    persons who used COX-2 inhibitors.

10    53.    Based upon readily available scientific data, Defendants knew, or should
11    have known, that their pre-approval testing of Celebrex did not adequately represent the cross-
12    section of individuals who were intended consumers and therefore, likely to take Celebrex.
13    Therefore, Defendants' testing and studies were grossly inadequate.

14    54.    Had Defendants done adequate testing prior to approval and "market
15    launch," rather than the extremely short duration studies done on the small size patient base that
16    was actually done the defendants' scientific data would have revealed significant increases in
17    incidence of strokes and myocardial infarctions among the intended and targeted population of
18    Celebrex consumers. Adequate testing would have shown that Celebrex possessed serious side
19    effects. Defendants should have taken appropriate measures to ensure that their defectively
20    designed product would not be placed in the stream of commerce and/or should have provided
21    full and proper warnings accurately and fully reflecting the scope and severity of symptoms of
22    those side effects should have been made.

23    55.    In fact, post-market approval data did reveal increased risks of clotting,
24    stroke and myocardial infarction, but this information was intentionally suppressed by Defendants
25    in order for them to gain significant profits from continued Celebrex sales.

26    56.    Defendants' failure to conduct adequate testing and/or additional testing
27    prior to "market launch" was based upon their desire to generate maximum financial gains for

28

Celebrex                                - 12 -                                COMPLAINT

1  themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2
2  inhibitor market.

3          57.    At the time Defendants manufactured, advertising, and distributed
4  Celebrex to consumers, Defendants intentionally or recklessly ignored and/or withheld
5  information regarding the increased risks of hypertension, stroke and/or myocardial infarctions
6  because Defendants knew that if such increased risks were disclosed, consumers would not
7  purchase Celebrex, but instead would purchase other cheaper and safer NSAIDs.

8  **D.    Facts Regarding Defendants' Marketing and Sale of Celebrex**

9          58.    Such an ineffective and unreasonably dangerous drug could only be widely
10  prescribed as a result of a tremendous marketing campaign. In addition to being aggressive, the
11  Defendants' marketing campaign was fraudulent and misleading. But for fraudulent and
12  misleading advertising, consumers, including the decedent, would not have purchased Celebrex, a
13  more costly prescriptive drug, ineffective for its intended purposes.

14          59.    On January 10, 2005 the FDA issued Pfizer a written reprimand for its
15  promotional activities. The reprimand reads: "These five promotional pieces [3 Celebrex and 2
16  Bextra] variously: omit material facts … and make misleading safety, unsubstantiated superiority,
17  and unsubstantiated effectiveness claims." This was not the Defendants first offense related to its
18  Cox-2 inhibitors. The FDA also reprimanded Pfizer on October 6, 1999 noting: "DDMAC has
19  reviewed these promotional pieces and has determined that they are false or misleading because
20  they contain unsubstantiated comparative claims, misrepresentations of Celebrex's safety profile,
21  and are lacking in fair balance." Ultimately, on April 8, 2005, the New York Times reported the
22  results of an FDA advisory panel: "The February advisory panel voted overwhelmingly that the
23  company should never again advertise the drug [Celebrex]."

24          60.    At all times relevant herein, Defendants engaged in a marketing campaign
25  with the intent that consumers would perceive Celebrex as a safer and better drug than its other
26  NSAIDs and, therefore, purchase Celebrex.

27          61.    Defendants widely and successfully marketed Celebrex throughout the
28  United States by, among other things, conducting promotional campaigns that misrepresented the

Celebrex                                  - 13 -                                  COMPLAINT

1   efficacy of Celebrex in order to induce a widespread use and consumption. Celebrex was
2   represented to aid the pain and discomfort of arthritis, osteoarthritis, and related problems.
3   Defendants made misrepresentations by means of media advertisements, and statements
4   contained in sales literature provided to Decedent's prescribing physicians.

5            62.    Despite knowledge of the dangers presented by Celebrex, Defendants and
6   Defendants' predecessors in interest, through their officers, directors and managing agents for the
7   purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy
8   the known defects of Defendants' product, Celebrex, and failed to warn the public, including
9   Decedent, of the serious risk of injury occasioned by the defects inherent in Defendants' product,
10  Celebrex. Defendants and their officers, agents and managers intentionally proceeded with the
11  inadequate safety testing, and then the manufacturing, sale and marketing of Defendants' product,
12  Celebrex, knowing that persons would be exposed to serious potential danger, in order to advance
13  their own pecuniary interests. Defendants' conduct was wanton and willful, and displayed a
14  conscious disregard for the safety of the public and particularly of Decedent.

15           63.    In an elaborate and sophisticated manner, Defendants aggressively
16  marketed Celebrex directly to consumers and medical professionals (including physicians and
17  leading medical scholars) in order to leverage pressure on third party payors, medical care
18  organizations, and large institutional buyers (*e.g.*, hospitals) to include Celebrex on their
19  formularies. Faced with the increased demand for the drug by consumers and health care
20  professionals that resulted from Defendants' successful advertising and marketing blitz, third
21  party payors were compelled to add Celebrex to their formularies. Defendants' marketing
22  campaign specifically targeted third party payors, physicians, and consumers, and was designed
23  to convince them of both the therapeutic and economic value of Celebrex.

24           64.    Defendants represented that Celebrex was similar to ibuprofen and
25  naproxen but was superior because it lacked any of the common gastrointestinal adverse side
26  effects associated with these and other non-steroidal anti-inflammatory drugs ("NSAIDS"). For
27  instance, NSAIDS can, in certain patients, cause gastrointestinal perforations, ulcers and bleeding
28  with long-term use. Defendants promoted Celebrex as a safe and effective alternative that would

Celebrex                                    - 14 -                                    COMPLAINT

1   not have the same deleterious and painful impact on the gut, but that would be just as effective, if
2   not more so, for pain relief.

3          65.    Celebrex possessed dangerous and concealed or undisclosed side effects,
4   including the increased risk of serious cardiovascular events, such as heart attacks, unstable
5   angina, cardiac clotting, deep vein thrombosis, hypertension, and cerebrovascular events, such as
6   strokes. In addition, Celebrex was no more effective than traditional and less expensive NSAIDs
7   and, just like traditional NSAIDs, carried a risk of perforations, ulcers, and gastrointestinal
8   bleeding. Defendants chose not to warn about these risks and dangers.

9          66.    Defendants knew of these risks before the U.S. Food and Drug
10  Administration (the "FDA") approved Celebrex for sale, but Defendants ignored, downplayed,
11  suppressed, omitted, and concealed these serious safety risks and denied inefficacy in its
12  promotion, advertising, marketing, and sale of Celebrex. Defendants' omission, suppression, and
13  concealment of this important information enabled Celebrex to be sold to, and purchased, or paid
14  for by, the Consumers at a grossly inflated price.

15         67.    Consequently, Celebrex captured a large market share of anti-inflammatory
16  drugs prescribed for and used by patients. In 2004 alone, sales of Celebrex exceeded \$2 billion,
17  despite the significantly higher cost of Celebrex as compared to other pain relievers in the same
18  family of drugs.

19         68.    Because Defendants engaged in a promotional and marketing campaign
20  that featured an advertising blitz directly targeted to consumers, that touted Celebrex as a safer
21  drug than other drugs in its class, while uniformly failing to disclose the health risks of Celebrex,
22  Defendants were able to justify pricing Celebrex significantly higher than the cost of generic
23  aspirin. In reality, that price inflation was not justified. Had Defendants disclosed the truth about
24  Celebrex, Defendants would not and could not have reaped the billions of dollars in Celebrex
25  sales that were achieved as a direct result of the concealment, omission, suppression, and
26  obfuscation of the truth.

27         69.    The Defendants intentionally, deliberately, knowingly, and actively
28  concealed, omitted, suppressed, and obfuscated important and material information regarding the

Celebrex                              - 15 -                                    COMPLAINT

1   risks, dangers, defects, and disadvantages of Celebrex from Decedent, the public, the medical

2   community, and the regulators. This concealment and omission was deliberate, knowing, active,

3   and uniform, was intended to induce and maximize sales and purchases of Celebrex, and

4   prevented Decedent from obtaining all the material information that would be important to their

5   decisions as reasonable persons to purchase, pay for, and/or use Celebrex.

6           70.     Defendants' systematic, active, knowing, deliberate, and uniform

7   concealment, omissions, suppression, and conduct caused Decedent to purchase, pay for, and/or

8   use Celebrex; and caused Decedent's losses and damages as asserted herein.

9           71.     Had Defendants done adequate testing prior to approval and "market

10  launch," the defendants' scientific data would have revealed significant increases in stroke and

11  myocardial infarction amongst the intended population of Celebrex consumers. Adequate testing

12  would have shown that Celebrex possessed serious side effects. Defendants should have taken

13  appropriate measures to ensure that their defectively designed product would not be placed in the

14  stream of commerce and/or should have provided full and proper warnings accurately and fully

15  reflecting the scope and severity of symptoms of those side effects should have been made.

16          72.     In fact, post-market approval data did reveal increased risks of clotting,

17  stroke and myocardial infarction, but this information was intentionally suppressed by Defendants

18  in order for them to gain significant profits from continued Celebrex sales.

19          73.     Defendants' failure to conduct adequate testing and/or additional testing

20  prior to "market launch" was based upon their desire to generate maximum financial gains for

21  themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2

22  inhibitor market.

23          74.     At the time Defendants manufactured, advertising, and distributed

24  Celebrex to consumers, Defendants intentionally or recklessly ignored and/or withheld

25  information regarding the increased risks of hypertension, stroke and/or myocardial infarctions

26  because Defendants knew that if such increased risks were disclosed, consumers would not

27  purchase Celebrex, but instead would purchase other cheaper and safer NSAID drugs.

28

Celebrex                                    - 16 -                                    COMPLAINT

1

## **CLAIMS FOR RELIEF**

2

3

## **FIRST CLAIM FOR RELIEF:**
### **Negligence**

4

75.    Plaintiff incorporates by reference all of the paragraphs of this Complaint

5

as if fully set forth herein.

6

76.    Defendants owed Decedent a duty to exercise reasonable care when

7

designing, manufacturing, marketing, advertising, distributing, and selling Celebrex. This duty

8

included the duty not to introduce a pharmaceutical drug, such as Celebrex, into the stream of

9

commerce that caused users to suffer from unreasonable, dangerous or untoward adverse side

10

effects.

11

77.    At all relevant times to this action, Defendants owed a duty to properly

12

warn Decedent and the Public of the risks, dangers and adverse side effects of their

13

pharmaceutical drug Celebrex.

14

78.    Defendants breached their duties by failing to exercise ordinary care in the

15

preparation, design, research, testing, development, manufacturing, inspection, labeling,

16

marketing, promotion, advertising and selling of Celebrex, including:

17

a.    failing to use due care in the preparation and development of

18

Celebrex to prevent the aforementioned risk of injuries to individuals when the drugs were

19

ingested;

20

b.    failing to use due care in the design of Celebrex to prevent the

21

aforementioned risk of injuries to individuals when the drugs were ingested;

22

c.    failing to conduct adequate pre-clinical testing and research to

23

determine the safety of Celebrex;

24

d.    failing to conduct adequate post-marketing surveillance and

25

exposure studies to determine the safety of Celebrex;

26

e.    failing to completely, accurately and in a timely fashion, disclose

27

the results of the pre-marketing testing and post-marketing surveillance and testing to Decedent,

28

consumers, the medical community, and the FDA;

Celebrex                                    - 17 -                                    COMPLAINT

1                      f.       failing to accompany Celebrex with proper warnings regarding all

2  possible adverse side effects associated with the use of Celebrex;

3                      g.       failing to use due care in the manufacture, inspection, and labeling

4  of CELEBREX to prevent the aforementioned risk of injuries to individuals who used Celebrex;

5                      h.       failing to use due care in the promotion of Celebrex to prevent the

6  aforementioned risk of injuries to individuals when the drugs were ingested;

7                      i.       failing to use due care in the sale and marketing of Celebrex to

8  prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

9                      j.       failing to use due care in the selling of Celebrex to prevent the

10  aforementioned risk of injuries to individuals when the drugs were ingested;

11                      k.       failing to provide adequate and accurate training and information to

12  the sales representatives who sold Celebrex;

13                      l.       failing to provide adequate and accurate training and information to

14  healthcare providers for the appropriate use of Celebrex; and

15                      m.       being otherwise reckless, careless and/or negligent.

16          79.       Despite the fact that Defendants knew or should have known that Celebrex

17  caused unreasonable and dangerous side effects which many users would be unable to remedy by

18  any means, Defendants continued to promote and market Celebrex to consumers, including

19  Decedent, when safer and more effective methods of pain relief were available.

20          80.       Defendants were, or should have been had they exercised reasonable care,

21  in possession of evidence demonstrating that Celebrex caused serious side effects. Nevertheless,

22  they continued to market their products by providing false and misleading information with

23  regard to the safety and efficacy of Celebrex.

24          81.       Defendants knew or should have known that consumers such as Decedent

25  would foreseeably suffer injuries as a result of their failure to exercise ordinary care as described

26  above.

27          82.       As a direct and proximate consequence of Defendants' acts, omissions, and

28  misrepresentations described herein, the Plaintiff and Decedent's siblings suffered loss of support

1    and services and endured mental pain and suffering and loss of consortium of their parent. The

2    losses are permanent and continuing in nature. In addition, the estate suffered a loss of net

3    accumulations due to the premature death of Decedent, and the personal representative incurred

4    medical and funeral expenses for the burial and funeral services of the decedent. Decedent

5    sustained serious cardiovascular injuries and death. Decedent required healthcare and services

6    incurring direct medical losses and costs including care for hospitalization, physician care,

7    monitoring, treatment, medications, and supplies.

8         83.    Defendants' conduct was committed with knowing, conscious, wanton,

9    willful, and deliberate disregard for the value of human life and the rights and safety of

10   consumers, including Decedent, thereby entitling Plaintiff to punitive and exemplary damages so

11   as to punish Defendants and deter them from similar conduct in the future.

12        84.    WHEREFORE, Plaintiff demands judgment against Defendants and seeks

13   compensatory damages, and exemplary and punitive damages together with interest, the costs of

14   suit and attorneys' fees and such other and further relief as this Court deems just and proper.

## SECOND CLAIM FOR RELIEF:
### Strict Liability

85.    Plaintiff incorporates by reference all previous paragraphs of this

Complaint as if fully set forth herein and further alleged as follows:

86.    At all times relevant to this action, Defendants were suppliers of Celebrex,

placing the drug into the stream of commerce. Celebrex was expected to and did reach Decedent

without substantial change in the condition in which it was manufactured and sold.

87.    Celebrex was unsafe for normal or reasonably anticipated use.

88.    Celebrex was defective in design or formulation because when it left the

hands of the manufacturer and/or supplier, it was unreasonably dangerous and more dangerous

than an ordinary consumer would expect. Celebrex was also defective and unreasonably

dangerous in that the foreseeable risk of injuries from Celebrex exceeded the benefits associated

with the design and/or formulation of the product.

1           89.     Celebrex is unreasonably dangerous: a) in construction or composition; b)

2 in design; c) because an adequate warning about the product was not provided; d) because it does

3 not conform to an express warranty of the manufacturer about the product .

4           90.     Celebrex as manufactured and supplied by Defendants was also defective

5 due to inadequate warnings, and/or inadequate clinical trials, testing and study, and inadequate

6 reporting regarding the results of the clinical trials, testing and study. Defendants failed to

7 perform adequate testing before exposing Decedent to the medication, testing which would have

8 shown that Celebrex had the potential to cause serious side effects including strokes like that

9 which affected Decedent.

10           91.     Celebrex as manufactured and supplied by Defendants was defective due to

11 inadequate post-marketing warnings or instructions because, after Defendants knew or should

12 have known of the risk of injuries from Celebrex, they failed to provide adequate warnings to the

13 medical community and the consumers, to whom they were directly marketing and advertising

14 Celebrex; and, further, it continued to affirmatively promote Celebrex as safe and effective.

15           92.     Celebrex was manufactured, distributed, tested, sold, marketed, advertised

16 and promoted defectively by Defendants, and as a direct and proximate cause of Defendants'

17 defective design of Celebrex, Decedent used Celebrex rather than other safer and cheaper

18 NSAIDs. As a result, Decedent suffered the personal injuries described above.

19           93.     Information given by Defendants to the medical community and to the

20 consumers concerning the safety and efficacy of Celebrex, especially the information contained in

21 the advertising and promotional materials, did not accurately reflect the potential side effects of

22 Celebrex.

23           94.     Had adequate warnings and instructions been provided, Decedent would

24 not have taken Celebrex as she did, and would not have been at risk of the harmful side effects

25 described herein.

26           95.     Defendants acted with conscious and deliberate disregard of the

27 foreseeable harm caused by Celebrex.

28

Celebrex                      - 20 -                     COMPLAINT

96.     Decedent could not, through the exercise of reasonable care, have

discovered Celebrex's defects or perceived the dangers posed by the drug.

97.     As a direct and proximate consequence of Defendants' acts, omissions, and

misrepresentations described herein, the Plaintiff, and Decedent's siblings suffered loss of support

and services and endured mental pain and suffering and loss of consortium of their parent. The

losses are permanent and continuing in nature. In addition, the estate suffered a loss of net

accumulations due to the premature death of Decedent, and the personal representative incurred

medical and funeral expenses for the burial and funeral services of the decedent. Decedent

sustained serious cardiovascular injuries and death. Decedent required healthcare and services

incurring direct medical losses and costs including care for hospitalization, physician care,

monitoring, treatment, medications, and supplies.

98.     Defendants' conduct was committed with knowing, conscious, wanton,

willful, and deliberate disregard for the value of human life and the rights and safety of

consumers, including Decedent, thereby entitling Plaintiff to punitive and exemplary damages so

as to punish Defendants and deter them from similar conduct in the future.

99.     WHEREFORE, Plaintiff demands judgment against Defendants and seeks

compensatory damages, and punitive and exemplary damages together with interest, the costs of

suit and attorneys' fees and such other and further relief as this Court deems just and proper.

### THIRD CLAIM FOR RELIEF:
### Breach of Express Warranty

100.     Plaintiff incorporates by reference all of the paragraphs of this Complaint

as if fully set forth herein.

101.     Defendants expressly represented to Decedent and other consumers and the

medical community that Celebrex was safe and fit for its intended purposes, that it was of

merchantable quality, that it did not produce any dangerous side effects, particularly any

unwarned-of side effects, and that it was adequately tested.

102.     These warranties came in the form of:

Celebrex                                  - 21 -                                  COMPLAINT

1                a.     Defendants' public written and verbal assurances of the safety and

2 efficacy of Celebrex;

3                b.     Press releases, interviews and dissemination via the media of

4 promotional information, the sole purpose of which was to create an increased demand for

5 Celebrex, which failed to warn of the risk of injuries inherent to the ingestion of Celebrex,

6 especially to the long-term ingestion of Celebrex;

7                c.     Verbal and written assurances made by Defendants regarding

8 Celebrex and downplaying the risk of injuries associated with the drug;

9                d.     False and misleading written information, supplied by Defendants,

10 and published in the Physician's Desk Reference on an annual basis, upon which physicians

11 relied in prescribing Celebrex during the period of Decedent's ingestion of Celebrex, and;

12                e.     advertisements.

13        103.     The documents referred to above were created by and at the direction of

14 Defendants.

15        104.     Defendants knew or had reason to know that Celebrex did not conform to

16 these express representations in that Celebrex is neither as safe nor as effective as represented,

17 and that Celebrex produces serious adverse side effects.

18        105.     Celebrex did not and does not conform to Defendants' express

19 representations because it is not safe, has numerous and serious side effects, including unwarned-

20 of side effects, and causes severe and permanent injuries.

21        106.     Decedent, other consumers, and the medical community relied upon

22 Defendants' express warranties.

23        107.     As a direct and proximate consequence of Defendants' acts, omissions, and

24 misrepresentations described herein, the Plaintiff, and Decedent's siblings suffered loss of support

25 and services and endured mental pain and suffering and loss of consortium of their parent. The

26 losses are permanent and continuing in nature. In addition, the estate suffered a loss of net

27 accumulations due to the premature death of Decedent, and the personal representative incurred

28 medical and funeral expenses for the burial and funeral services of the decedent. Decedent

1   sustained serious cardiovascular injuries and death. Decedent required healthcare and services

2   incurring direct medical losses and costs including care for hospitalization, physician care,

3   monitoring, treatment, medications, and supplies.

4          108.    Defendants' conduct was committed with knowing, conscious, wanton,

5   willful, and deliberate disregard for the value of human life and the rights and safety of

6   consumers, including Decedent, thereby entitling Plaintiff to punitive and exemplary damages so

7   as to punish Defendants and deter them from similar conduct in the future.

8          109.    WHEREFORE, Plaintiff demands judgment against Defendants and seeks

9   compensatory damages, and punitive and exemplary damages together with interest, the costs of

10  suit and attorneys' fees and such other and further relief as this Court deems just and proper.

11  **FOURTH CLAIM FOR RELIEF:**
**Breach of Implied Warranty**

12          110.    Plaintiff incorporates by reference all of the paragraphs of this Complaint

13  as if fully set forth herein.

14          111.    Defendants manufactured, distributed, advertised, promoted, and sold

15  Celebrex.

16          112.    At all relevant times, Defendants knew of the use for which Celebrex was

17  intended and impliedly warranted the product to be of merchantable quality and safe and fit for

18  such use.

19          113.    Celebrex was not of merchantable quality and was not fit for its intended

20  use, because it causes increased risk of serious cardiovascular and cerebrovasclar adverse events,

21  including heart attacks, strokes and other serious and harmful adverse health effects.

22          114.    Defendants breached the implied warranty that Celebrex was of

23  merchantable quality and fit for such use in violation of Nevada law.

24          115.    Defendants were aware that consumers, including Decedent, would use

25  Celebrex for treatment of pain and inflammation and for other purposes.

26          116.    Decedent and the medical community reasonably relied upon Defendants'

27  judgment and expertise to only sell them or allow them to prescribe Celebrex only if it was indeed

28

Celebrex                              - 23 -                                   COMPLAINT

1    of merchantable quality and safe and fit for its intended use. Consumers, including Decedent, and

2    the medical community, reasonably relied upon Defendants' implied warranty for Celebrex.

3          117.    Celebrex reached consumers, including Decedent, without substantial

4    change in the condition in which it was manufactured and sold by Defendants.

5          118.    Defendants breached their implied warranty to consumers, including

6    Decedent; Celebrex was not of merchantable quality or safe and fit for its intended use.

7          119.    As a direct and proximate consequence of Defendants' acts, omissions, and

8    misrepresentations described herein, the Plaintiff, and Decedent's siblings suffered loss of support

9    and services and endured mental pain and suffering and loss of consortium of their parent. The

10    losses are permanent and continuing in nature. In addition, the estate suffered a loss of net

11    accumulations due to the premature death of Decedent, and the personal representative incurred

12    medical and funeral expenses for the burial and funeral services of the decedent. Decedent

13    sustained serious cardiovascular injuries and death. Decedent required healthcare and services

14    incurring direct medical losses and costs including care for hospitalization, physician care,

15    monitoring, treatment, medications, and supplies.

16          120.    Defendants' conduct was committed with knowing, conscious, wanton,

17    willful, and deliberate disregard for the value of human life and the rights and safety of

18    consumers, including Decedent, thereby entitling Plaintiff to punitive and exemplary damages so

19    as to punish Defendants and deter them from similar conduct in the future.

20          121.    WHEREFORE, Plaintiff demands judgment against Defendants and seeks

21    compensatory damages and punitive and exemplary damages together with interest, the costs of

22    suit and attorneys' fees, and such other and further relief as this Court deems just and proper.

23
### FIFTH CLAIM FOR RELIEF:
#### Fraudulent Misrepresentation & Concealment

24

25          122.    Plaintiff incorporates by reference all of the paragraphs of this Complaint
as if fully set forth herein.

26

27          123.    Defendants' superior knowledge and expertise, their relationship of trust
and confidence with doctors and the public, their specific knowledge regarding the risks and

28

1   dangers of Celebrex, and their intentional dissemination of promotional and marketing

2   information about Celebrex for the purpose of maximizing its sales, each gave rise to the

3   affirmative duty to meaningfully disclose and provide all material information about Celebrex's

4   risks and harms to doctors and consumers.

5           124.    Defendants made fraudulent affirmative misrepresentations with respect to

6   Celebrex in the following particulars:

7                   a.      Defendants represented through their labeling, advertising,

8   marketing materials, detail persons, seminar presentations, publications, notice letters, and

9   regulatory submissions that Celebrex had been tested and found to be safe and effective for the

10  treatment of pain and inflammation; and

11                  b.      Defendants represented that Celebrex was safer than other

12  alternative medications.

13          125.    Defendants made affirmative misrepresentations; and fraudulently,

14  intentionally and/or recklessly concealed material adverse information regarding the safety and

15  effectiveness of Celebrex.

16          126.    Defendants made these misrepresentations and actively concealed adverse

17  information at a time when Defendants knew or had reason to know that Celebrex had defects and

18  was unreasonably dangerous and was not what Defendants had represented to the medical

19  community, the FDA and the consuming public, including Decedent.

20          127.    Defendants omitted, suppressed and/or concealed material facts concerning

21  the dangers and risk of injuries associated with the use of Celebrex including, but not limited to,

22  the cardiovascular, cerebrovascular, and other serious health risks. Furthermore, Defendants'

23  purpose was willfully blind to, ignored, downplayed, avoided, and/or otherwise understated the

24  serious nature of the risks associated with the use of Celebrex in order to increase its sales.

25          128.    The representations and concealment were undertaken by Defendants with

26  an intent that doctors and patients, including Decedent, rely upon them.

27

28

Celebrex                              - 25 -                              COMPLAINT

129.    Defendants' representations and concealments were undertaken with the intent of defrauding and deceiving Decedent, other consumers, and the medical community to induce and encourage the sale of Celebrex.

130.    Defendants' fraudulent representations evinced their callous, reckless, willful, and depraved indifference to the health, safety, and welfare of consumers, including Decedent.

131.    Decedent's physician and Decedent relied on and were induced by Defendants' misrepresentations, omissions, and/or active concealment of the dangers of Celebrex in selecting Celebrex treatment.

132.    Decedent and the treating medical community did not know that the representations were false and were justified in relying upon Defendants' representations.

133.    Had Decedent been aware of the increased risk of side effects associated with Celebrex and the relative efficacy of Celebrex compared with other readily available medications, Decedent would not have taken Celebrex as she did.

134.    As a direct and proximate consequence of Defendants' acts, omissions, and misrepresentations described herein, the Plaintiff, Decedent's siblings suffered loss of support and services and endured mental pain and suffering and loss of consortium of their parent.  The losses are permanent and continuing in nature.  In addition, the estate suffered a loss of net accumulations due to the premature death of Decedent, and the personal representative incurred medical and funeral expenses for the burial and funeral services of the decedent.  Decedent sustained serious cardiovascular injuries and death.  Decedent required healthcare and services incurring direct medical losses and costs including care for hospitalization, physician care, monitoring, treatment, medications, and supplies.

135.    Defendants' conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Decedent, thereby entitling Plaintiff to punitive and exemplary damages so as to punish Defendants and deter them from similar conduct in the future.

136.    WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages, and punitive and exemplary damages together with interest, the costs of suit and attorneys' fees, and such other and further relief as this Court deems just and proper.

## SIXTH CLAIM FOR RELIEF
### (Unjust Enrichment)

137.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

138.    At all times relevant to this action, Defendants were the manufacturers, sellers, and/or suppliers of Celebrex.

139.    Decedent paid for Celebrex for the purpose of managing her pain safely and effectively.

140.    Defendants have accepted payment from Decedent for the purchase of Celebrex.

141.    Decedent did not received the safe and effective pharmaceutical product for which she paid.

142.    It is inequitable and unjust for Defendants to retain this money because the Decedent did not in fact receive the product Defendant represented Celebrex to be.

143.    WHEREFORE, Plaintiff demands judgment against Defendants and seeks equitable relief, the costs of suit and attorneys' fees, and such other and further relief as this Court deems just and proper.

## SEVENTH CLAIM FOR RELIEF
### (Violations of State Consumer Fraud and Deceptive Trade Practices Acts)

144.    Plaintiff incorporates by reference the preceding paragraphs as if they were fully set forth herein.

145.    Defendants had a statutory duty to refrain from unfair or deceptive acts or practices in the sale and promotion of Celebrex to Plaintiff.

146.    Defendants engaged in unfair, unconscionable, deceptive, fraudulent and misleading acts or practices in violation of all California's consumer protection laws, identified below.  Through its false, untrue and misleading promotion of Celebrex, Defendants induced

1   Decedent to purchase and/or pay for the purchase of Celebrex. Defendants misrepresented the
2   alleged benefits and characteristics of Celebrex; suppressed, concealed and failed to disclose
3   material information concerning known adverse effects of Celebrex; misrepresented the quality of
4   Celebrex as compared to much lower-cost alternatives; misrepresented and advertised that
5   Celebrex was of a particular standard, quality or grade that it was not; misrepresented Celebrex in
6   such a manner that later, on disclosure of the true facts, there was a likelihood that Decedent
7   would have switched from Celebrex to another NSAID and/or chosen not to purchase and/or
8   reimburse for purchases of Celebrex; advertised Celebrex with the intent not to sell it as
9   advertised; and otherwise engaged in fraudulent and deceptive conduct.

10          147.    Defendants' conduct created a likelihood of, and in fact caused, confusion
11   and misunderstanding. Defendants' conduct misled, deceived and damaged Decedent and
12   Defendants' fraudulent, misleading and deceptive conduct was perpetrated with an intent that
13   Decedent rely on said conduct by purchasing and/or paying for purchases of Celebrex. Moreover,
14   Defendants knowingly took advantage of Decedent who was reasonably unable to protect her
15   interests due to ignorance of the harmful adverse effects of Celebrex. Defendants' conduct was
16   willful, outrageous, immoral, unethical, oppressive, unscrupulous, unconscionable and
17   substantially injurious to Decedent and offends the public conscience.

18          148.    Decedent purchased Celebrex primarily for personal, family or household
19   purposes.

20          149.    As a result of Defendants' violative conduct, Plaintiff purchased and/or
21   paid for purchases of Bextra that were not made for resale.

22          150.    Defendants engaged in unfair competition or deceptive acts or practices in
23   violation of Nevada law.

24          151.    As a proximate result of Defendants' misrepresentations and omissions,
25   Decedent and Plaintiff have suffered ascertainable losses, in an amount to be determined at trial.

26          152.    Throughout the period described in this Complaint, Defendants repeatedly
27   engaged in intentional misconduct characterized by trickery, deceit and a wanton, willful,
28   conscious and reckless disregard of the health, rights and interests of the Decedent, and, in so

Celebrex                                  - 28 -                                      COMPLAINT

1   conducting itself, acted with oppression, fraud, and malice toward the Decedent. As a result of

2   Defendants' indifference to and reckless disregard of the health and safety of Celebrex patients,

3   they suffered both physical and economic harm, and all end-payors incurred economic damages.

4   Accordingly, Defendants' conduct was highly reprehensible under controlling Supreme Court

5   punitive damages authority, and Plaintiff is entitled to punitive and/or exemplary damages.

6          153.   As a direct and proximate consequence of Defendants' acts, omissions, and

7   misrepresentations described herein, the Plaintiff, and Decedent's siblings suffered loss of support

8   and services and endured mental pain and suffering and loss of consortium of their parent. The

9   losses are permanent and continuing in nature. In addition, the estate suffered a loss of net

10  accumulations due to the premature death of Decedent, and the personal representative incurred

11  medical and funeral expenses for the burial and funeral services of the decedent. Decedent

12  sustained serious cardiovascular injuries and death. Decedent required healthcare and services

13  incurring direct medical losses and costs including care for hospitalization, physician care,

14  monitoring, treatment, medications, and supplies.

15         154.   Defendants' conduct was committed with knowing, conscious, wanton,

16  willful, and deliberate disregard for the value of human life and the rights and safety of

17  consumers, including Decedent, thereby entitling Plaintiff to punitive and exemplary damages so

18  as to punish Defendants and deter them from similar conduct in the future.

19         155.   WHEREFORE, Plaintiff demands judgment against Defendants and seeks

20  compensatory damages, and punitive and exemplary damages together with interest, the costs of

21  suit and attorneys' fees and such other and further relief as this Court deems just and proper.

22                            **PRAYER FOR RELIEF**

23        WHEREFORE, Plaintiff requests the following relief:

24        1.    General damages in excess of the jurisdictional amount of this Court;

25        2.    Consequential damages;

26        3.    Disgorgement of profits;

27        4.    Restitution;

28        5.    Punitive and exemplary damages;

6.    Pre-judgment and post-judgment interest as provided by law;

7.    Recovery of Decedent's costs including, but not limited to, discretionary

Court costs of these causes, and those costs available under the law, as well as expert fees and

attorneys' fees and expenses, and costs of this action; and

8.    Such other and further relief as the Court deems just and proper.

Dated: September 13, 2007                      Respectfully submitted,

By:_____

B. Kristian W. Rasmussen, III, FL Bar No. 0229430
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, P.A.
316 South Baylen Street, Suite 600 (32502)
P. O. Box 12308
Pensacola, Florida 32591
Telephone:  (850) 435-7080
Facsimile:  (850) 435-7020

Attorneys for Plaintiff

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims so triable in this action.

Dated: September 13, 2007                    Respectfully submitted,

By:_____

B. Kristian W. Rasmussen, III, FL Bar No. 0229430
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, P.A.
316 South Baylen Street, Suite 600 (32502)
P. O. Box 12308
Pensacola, Florida 32591
Telephone: (850) 435-7080
Facsimile: (850) 435-7020

Attorneys for Plaintiff